Filed 7/29/15  P. v. Baez CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH ANTHONY BAEZ,<br><br>    Defendant and Appellant. | G049120<br><br>(Super. Ct. No. 11ZF0107)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed as modified.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette Cavalier and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

While the wife of a fellow gang member was in the midst of a drug purchase, defendant and appellant Joseph Baez (defendant) shot and killed the drug dealer.  Defendant testified that he was afraid the woman, who had gotten into the drug dealer's car, was being kidnapped.  During deliberations, two jurors expressed their disbelief of defendant's defense, stating that they had made drug purchases themselves and it was commonplace for them to take place in the drug dealer's moving car.  In entertaining this discussion the jury did not, as defendant asserts, engage in misconduct that deprived him of his constitutional rights.  Rather, defendant got what he was entitled to—a jury of his peers—some of whom had experience in purchasing drugs.

We hold the trial court did not err in denying defendant's motion for a new trial based on juror misconduct.  Furthermore, we reject defendant's arguments that he had no notice he should defend against a charge of personal gun use and that the Penal Code section 186.22, subdivision (b)(1) gang enhancement was improper.  However, we agree with defendant's contentions that the sentence for the Penal Code section 186.22, subdivision (a) street terrorism conviction should have been stayed under Penal Code section 654 and that certain minute orders must be corrected.  We also agree with the People's assertion that the abstract of judgment must be corrected to reflect the sentence on the street terrorism conviction, but we add that the abstract of judgment must also reflect that the sentence is stayed.

I

FACTS

*A.  Background:*

Defendant was a member of the Orange Varrio Cypress gang (OVC).  Robert Reil was a shotcaller, or gang leader, of OVC.  He was married to Amour Villamar, a member of the Anaheim Travelers gang, an enemy gang.  Villamar was a methamphetamine addict.

Villamar and Reil attended a New Year's party in Orange at the house of one of Reil's "homeboys," or gang members.  They were at the party for a day or two.

2

On the night of the incident, January 3, 2010, while still at the party, Villamar wanted to get high, but was out of drugs. She called Bernal Felix, a drug dealer from whom she had purchased five or 10 times. He was not her regular dealer, but she thought he would come to their location. When she purchased from Felix, she would call him on the telephone, he would come in his car, she would get in the car, do the transaction, and get out.

Villamar was with Reil and defendant when she called Felix. Defendant wanted to know about amounts or prices. Villamar asked Felix to meet her at a particular street. Reil asked another OVC gang member, Christian Galindo, to drive them to Oak Street, where they were going to meet Felix.

Galindo, Villamar, Reil and defendant drove to Oak Street, which was disputed gang territory. Defendant knew there could be trouble if they ran into a rival gang. When they got to Oak Street, Villamar got out of the car first. Shortly afterwards, defendant and Reil got out of the car as well. Defendant and Reil were both carrying guns. Villamar went over to Felix's car and saw that he had a passenger in his car. It was Felix's friend, Carlos Lopez. Villamar got into the back seat of Felix's car and told him to move the car.

Felix slowly began to pull forward and Villamar saw in the glass the reflection of a silhouette, which was not Reil's. According to Villamar, seconds after the car started to move, she heard a loud noise like a window breaking and Felix slumped over, screaming in pain. Her first thought was to jump out of the car.

According to Lopez, Felix moved the car "very slowly" in response to Villamar's request. Lopez heard an "explosion" when the car had traveled not more than 100 meters. Lopez felt pieces of glass fall. Lopez "saw a shadow, and it put a hand inside with a pistol. And [the man with the pistol] said, 'What's up, homie,' and he fired." Felix slumped over, Villamar started screaming, and both she and Lopez jumped out of the car and ran.

3

According to defendant, he was not expecting there to be two men in Felix's car. He testified he was surprised when Villamar got in the back of the car, because he thought she was just going "to pick up the dope and leave." He also testified that he did not expect the car to start moving and he panicked, thinking the men were going to kidnap her.

Defendant ran towards Felix's car and pulled out his gun. He said his objective was to stop the car and he broke the windshield with the butt of his gun. When he did so, it sounded like an explosion. Defendant testified that he said, "Stop the . . . car." But the car was still moving, so he "struck down again with the gun" and it went off. He testified that he did not mean to shoot Felix and he denied having said, "What's up, homie?" Defendant also testified that he later learned his gun had gone off twice, but he had not realized it at the time.

When Villamar started to run, she heard Reil call her name and yell at her to get in Galindo's car. Villamar, Reil, Galindo and defendant drove away together. According to defendant, Reil started yelling, "'What . . . happened?'" and defendant replied, "What was I supposed to do? I seen him driving away with her.'" Further according to defendant, Villamar told Reil she had asked Felix to move the car and Reil said it was all her fault.

Felix died of a gunshot wound. Sometime after the shooting, defendant discussed the matter with his girlfriend, Tanya Dominguez. Defendant told her that he, Reil, Galindo and Villamar had gone to buy drugs, but it "went wrong." Defendant initially told Dominguez that Reil had shot Felix, but when she pressed him on the point, defendant confessed that he himself had done it.

B. *Procedural Information:*

*(1) Indictment and conviction—*

Defendant was indicted for murder with malice aforethought (Pen. Code, § 187, subd. (a)), participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)),

4

and four counts of disobeying a court order, i.e., a gang injunction (Pen. Code, § 166, subd. (a)(4)). In addition, the amended indictment alleged that defendant intentionally committed the murder while participating in a criminal street gang and in furtherance of the activities of the gang (Pen. Code, § 190.2, subd. (a)(22)), and while lying in wait (Pen. Code, § 190.2, subd. (a)(15)). It further alleged that defendant was a principal in the commission of a felony for the benefit of a street gang, and that another principal intentionally discharged a firearm causing the death of one who was not an accomplice (Pen. Code, §§ 12022.53, subds. (d), (e)(1), 667.5, 1192.7) and that he did so for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)). Finally, it was alleged that defendant had a number of prior convictions.

The jury found defendant guilty of second degree murder and street terrorism. It further found it true that, during the commission of the murder, defendant was a gang member who, either personally or vicariously, had discharged a firearm causing death and who had committed the crime for the benefit of the gang. The court found a number of prior conviction allegations to be true.

*(2) New trial motion—*

Before the sentencing took place, defendant's attorney filed the declaration of one of the jurors. The declarant stated that two other jurors had discussed their personal drug purchases during deliberations.

Defendant filed a new trial motion based on the declaration. The court found there was no juror misconduct. It further determined that the conduct, even were it characterized as misconduct, was not prejudicial. The court denied the motion.

*(3) Sentencing—*

The court originally sentenced defendant to 15 years to life on the count 1 murder conviction, 25 years to life on the Penal Code section 12022.53, subdivisions (d) and (e)(1) enhancement, to run consecutively to the sentence on count 1, 10 years on the Penal Code section 186.22, subdivision (b)(1) enhancement on count 1, to run concurrently with the sentence on count 1, two years on the Penal Code section 186.22,

5

subdivision (a) street terrorism count 2, to run concurrently with the sentence on count 1, and five years for a prior conviction under Penal Code section 667, subdivision (a)(1). The court exercised its discretion to strike certain of the prior convictions. The total sentence was 45 years to life.

On October 4, 2013, defendant filed an appeal. On October 22, 2013, the court corrected the sentence nunc pro tunc. The court's minutes reflect that the sentence on count 2 (Pen. Code, § 186.22, subd. (a)), was entered in error. The court deleted the "disposition of Found Guilty by Jury as to count(s) 2" and dismissed count 2 for "[o]ther reason." The minutes also include an October 22, 2013 entry stating: "DOJ Correction Abstract sent."

The abstract of judgment filed November 13, 2013 reflects the second degree murder conviction, the Penal Code section 12022.53, subdivisions (d) and (e)(1) enhancement, the Penal Code section 186.22, subdivision (b)(1) enhancement, and the Penal Code section 667, subdivision (a)(1) enhancement. It does not show a street terrorism (Pen. Code, § 186.22, subd. (a)) conviction.

II

DISCUSSION

A. *Juror Misconduct:*

*(1) Introduction—*

Defendant claims the court erred in denying his new trial motion. He maintains that two jurors committed misconduct and their misconduct was prejudicial.

"A juror may commit misconduct by receiving or proffering to other jurors information about the case that was not received in evidence at trial. [Citation.]" (*In re Lucas* (2004) 33 Cal.4th 682, 696.) "Juror misconduct generally raises a rebuttable presumption of prejudice, but '[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no

6

reasonable likelihood that one or more jurors were actually biased against the defendant.' [Citation.]" (*Ibid.*)

"'[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test.' [Citations.]" (*In re Lucas*, *supra*, 33 Cal.4th at pp. 696-697.)

"We review independently the trial court's denial of a new trial motion based on alleged juror misconduct. [Citation.] However, we will '"accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence."' [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 396.)

*(2) Alleged misconduct—*

The juror declaration in question stated: "During the jury deliberations there was considerable discussion about the testimony of [defendant] where [defendant] said he was surprised by the fact that [Amour] Villamar had gotten into the car of the drug dealer, Mr. Felix. There was also discussion among the jurors regarding [defendant's] testimony that he believed Ms. Villamar was being kidnapped because Mr. Felix's car began to move with her inside as well as his belief that he felt he needed to act to save her. [¶] . . . One of the male jurors told the rest of the jury, during deliberations, that he had been a drug user himself. The juror told us that he had personal experience in how drug transactions occur. He told us that when he was a drug user he had purchased drugs many times, that he personally knew from his own experience, drug deals are frequently transacted in the back of cars, and that this is an 'ordinary expected thing.'

7

This juror also said that . . . defendant should not have been 'surprised' by Ms. Villamar entering Mr. Felix's vehicle or by anything that happened after she got into the car. The juror told all the rest of us (jurors) that because of his own experience in buying drugs [defendant's] testimony wasn't believable."

The juror further declared: "After hearing the male juror tell us what his own drug usage history was and the knowledge he had gained from his own drug purchases, another juror, . . . a woman, stated that based on her own personal knowledge, the sale and purchase of drugs frequently occur in cars. She agreed with the male juror that [defendant's] testimony was not believable because her personal experience told her that he should not have been surprised by Ms. Villamar getting into Mr. Felix's car to complete the purchase of the drugs. In addition, the vehicle moving with her inside was not something that should have caused [defendant] concern because her own experience taught her that nothing that happened in this case was out of the ordinary in a drug purchase transaction. [¶] . . . After listening to the two jurors describe their personal experiences and relate their knowledge of how drug purchases are ordinarily done, the majority of the jurors agreed that [defendant] was not credible in regard to his testimony."

*(3) Analysis—*

The two jurors in question expressed their disbelief in defendant's defense—that he thought he needed to save Villamar because the car was moving and she was being kidnapped. They questioned his credibility based on their own personal experiences as drug purchasers, and said it was a normal part of a drug buy to make the purchase in a moving car.

According to defendant, these two jurors "presented themselves as pseudo-experts: persons who had access to specialized knowledge about the norms of the drug trade based on their experiences buying illegal narcotics from small-time, end-user dealers . . . ." We disagree.

As our Supreme Court has stated: "A juror may commit misconduct by receiving or proffering to other jurors information about the case that was not received in evidence at trial. [Citation.] We have explained, however, that '[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. *Jurors' views of the evidence, moreover, are necessarily informed by their life experiences*, including their education and professional work. A juror, however, should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct.' [Citation.]" (*In re Lucas*, *supra*, 33 Cal.4th at p. 696.)

Here, the jurors were, in effect, expressing their agreement with the expert testimony received at trial. As the People point out, expert witness Miguel Cuenca testified that it was "very common" for a purchaser to get in the car with a drug dealer in order to make the purchase, and for the car to move a short distance while the transaction takes place. He explained it was safer to transact business in the car because "you're not stationary. People can't see you. And you're moving around. That way, if the local agency law enforcement is on surveillance or they're watching you, it's easier to go mobile . . . . So it's a lot harder for us to identify that transaction because it's in a vehicle and that vehicle is moving."

So, the jury already had this expert witness evidence when the two jurors in question expressed their disbelief in defendant's story. Their personal experiences as to the manner in which a typical drug purchase takes place were consistent with the description of a typical drug buy as given by the expert witness. No doubt their conclusions as to defendant's credibility were reinforced by their own experiences.

As the *Lucas* court stated: "'Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience.' [Citation.] This experience may stem from education or employment,

9

but sometimes it comes from other personal experiences.  We previously have explained that illicit drugs and their effects have become a matter of common knowledge or experience, and that '[j]urors cannot be expected to shed their backgrounds and experiences at the door of the deliberation room.'  [Citations.]  Rather, 'jurors are expected to bring their individual backgrounds and experiences to bear on the deliberative process.'  [Citation.]"  (*In re Lucas*, *supra*, 33 Cal.4th at p. 696.)

In *In re Lucas*, *supra*, 33 Cal.4th 682, the defendant was convicted of two counts of first degree murder and burglary.  (*Id.* at p. 690.)  His defense was based on having been grossly intoxicated by drugs, including crystal methamphetamine, cocaine and heroin.  In his habeas corpus petition, the defendant asserted juror misconduct.  (*Id.* at p. 688-689, 691-692.)  A juror who had personal experience with heroin, cocaine, amphetamines, LSD and marijuana said during jury deliberations, "'Well, I'm not trying to tell you anything, but I do have some experience in using drugs, and I've seen a lot of people use drugs, and I've never seen them do what this man has done,' that is, 'slaughtering his next door neighbors.'"  (*Id.* at p. 694.)  The juror's "own opinion was that [the] petitioner's crimes were not caused by his drug use."  (*Id.* at p. 695.)  The Supreme Court concluded that the juror's statements merely reflected his background and experiences.  (*In re Lucas*, *supra*, 33 Cal.4th at pp. 689, 697.)  It stated:  "We observe that a juror's statement that a defendant's sole defense is not credible does not, of course, by itself constitute misconduct.  [T]he evidence does not suggest that [the juror] brought highly technical information before the jury."  (*Id.* at p. 697.)  The court continued, "[the juror] did not hold himself out as an expert in a technical matter on the basis of his education or occupation, but merely related his own experience.  Under the circumstances, [the juror's] apparently brief comments merely reflected his own experience as it related to the evidence received at the trial and the inferences that [the] petitioner sought to have the jurors draw from that evidence.  His experience, although not shared by the majority of persons, is fairly common."  (*Ibid.*)

The matter before us is similar. The jury had received expert testimony on typical drug buys and two jurors had themselves experienced typical drug buys. These two jurors were not holding themselves out as technical experts. Rather, they simply related their own experiences in making drug purchases—an activity that is fairly common these days.

Defendant contends that this case is dissimilar to *In re Lucas, supra,* 33 Cal.4th 682, because the situation there dealt with experience in simple drug usage, whereas the matter here has to do with "a more esoteric body of knowledge"—the "norms of buying drugs[.]" This begs the question whether the average drug user acquires drugs without buying them.

In any event, we conclude that the two jurors did not commit misconduct when they shared their personal experiences, consistent with expert testimony. That being the case, we need not address the question of prejudice. We nonetheless choose to address whether the sharing of their personal experiences could have been prejudicial under the circumstances.

*(4) Prejudice—*

Our Supreme Court has stated: "'When juror misconduct involves the receipt of information about a party or the case from extraneous sources, the verdict will be set aside only if there appears a substantial likelihood of juror bias. [Citation.] Such bias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not "inherently" prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was "actually biased" against the defendant. If we find a substantial likelihood that a juror was actually biased, we must set aside the verdict . . . .'" (*In re Boyette* (2013) 56 Cal.4th 866, 890-891.)

In *In re Boyette*, *supra*, 56 Cal.4th 866, a death row defendant filed a habeas corpus petition based in part on juror misconduct. The referee found that two

11

jurors had committed misconduct when, at the instance of a third juror, they watched a movie on the prison system in order to gain insight into "the realities of life in prison." (*Id.* at pp. 891-892.) The respondent conceded that the jurors had committed misconduct. (*Id.* at p. 892.)

The Supreme Court determined that the jurors' conduct in that case did not establish a substantial likelihood of juror bias. (*In re Boyette*, *supra*, 56 Cal.4th at p. 892.) The court first determined that the content of the movie was not the type of "evidence that, 'judged objectively, [was] so prejudicial *in and of itself* that it [was] *inherently* and substantially *likely* to have influenced a juror.' [Citation.]" (*Ibid.*) "The information, for example, was not of a suppressed confession or evidence of other crimes that the trial court had excluded as too prejudicial. [Citations.] It was not akin to a bell that could not be unrung." (*Id.* at pp. 892-893.)

The court continued on to state the movie was one at least two other jurors had already seen and the most that could be said was that the jurors who engaged in misconduct "may have learned some general information about prison life that some of the other jurors already knew . . . ." (*In re Boyette*, *supra*, 56 Cal.4th at p. 893.) The court also concluded the record did not show "that 'from the nature of the misconduct and the surrounding circumstances, . . . it [was] substantially likely a juror was "actually biased" against' [the] petitioner. [Citation.]" (*Id.* at p. 893.)

Similarly, in the matter before us, the information the two jurors imparted—that in their experience it was commonplace for a drug purchaser to get into the backseat of the drug dealer's vehicle and for the driver to move the car—was not prejudicial in and of itself. The information "was not of a suppressed confession or evidence of other crimes that the trial court had excluded as too prejudicial. [Citations.] It was not akin to a bell that could not be unrung." (*In re Boyette*, *supra*, 56 Cal.4th at pp. 892-893.)

Furthermore, given the surrounding circumstances, notably that the information provided by the jurors was the same as that provided by the expert witness, it

is not substantially likely that the jurors were "actually biased" against defendant.  The substantial likelihood of actual bias "'standard is a pragmatic one, mindful of the "day-to-day realities of courtroom life" [citation] and of society's strong competing interest in the stability of criminal verdicts [citations].  It is "virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."  [Citation.] Moreover, the jury is a "fundamentally human" institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution.  [Citation.]  "[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . .  [Jurors] are imbued with human frailties as well as virtues.  If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias."'  [Citation.]"  (*In re Boyette*, *supra*, 56 Cal.4th at p. 897.)

Defendant maintains that "[t]here remains a substantial likelihood that the two jurors' misconduct actually biased at least one juror against [him]."  This is because, he asserts, the majority of jurors did not agree defendant was lacking in credibility until after the two jurors in question had expressed their views.

However, as the People aptly retort, Evidence Code section 1150, subdivision (a) provides:  "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible *to show the effect* of such statement, conduct, condition, or event *upon a juror either in influencing him* to assent to or dissent from the verdict *or concerning the mental processes* by which it was determined."  (Italics added.)  In short, to draw conclusions about the significance jurors attached to the information they heard would be an "improper intrusion[] into the subjective reasoning process of the jurors in violation of Evidence Code section 1150. [Citation.]"  (*People v. Collins* (2010) 49 Cal.4th 175, 250.)

13

*B. Sentencing Errors:*

 *(1) Gun enhancement based on amended indictment—*

 The amended indictment states: "As to Count(s) 1, it is further alleged pursuant to Penal Code sections 12022.53 *(d) and (e)(1)* (GANG MEMBER VICARIOUS DISCHARGE FIREARM CAUSING DEATH), . . . defendant JOSEPH ANTHONY BAEZ was a principal in the commission of a felony, . . . and that during the commission and attempted commission of the above offense, *another principal* intentionally discharged a firearm causing death . . . ."[1] (Italics added.)

 The jury verdict on the Penal Code section 12022.53 enhancement states: "We the Jury in the above-entitled action <u>FIND IT TO BE TRUE</u> that the Defendant, JOSEPH ANTHONY BAEZ, was a gang member who *personally or* vicariously discharged a firearm causing Death . . . ." (Italics added.)

 In a further briefing order,[2] we requested that the parties brief the significance "of the conflict in the language of the amended indictment, concerning the discharge of a firearm by '*another principal*,' and the language of the jury verdict that [defendant] '*personally or* vicariously' discharged a firearm." (Italics added.)

---

[1] Penal Code section 12022.53, subdivision (d) provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony . . . , personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." Penal Code section 12022.53, subdivision (e)(1) states: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

[2] By order dated March 20, 2015, this court vacated submission and requested supplemental briefing on five points. (Cal. Rules Court, rule 8.256(e)(1).) Four of those issues arose out of the October 22, 2013 nunc pro tunc order and one arose out of the amended indictment.

14

In his supplemental letter brief, defendant cites Penal Code section 12022.53, subdivision (j), which provides: "For the penalties in this section to apply, the existence of any fact required under subdivision (b), (c), or (d) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact. . . ." Defendant says he "had no occasion to defend against an allegation that he personally discharged the gun because no such allegation was ever lodged by the indictment or the instructions." We disagree with this characterization of the record.

"'The [indictment] must be given a reasonable interpretation and read as a whole with its parts considered in their context. [Citation.]'" (*People v. Keating* (1993) 21 Cal.App.4th 145, 150-151; accord, *People v. Biane* (2013) 58 Cal.4th 381, 388.) By citing subdivision (d) of Penal Code section 12022.53, the amended indictment put defendant on notice that it would be argued he personally discharged the gun and should be subjected to the subdivision (d) enhancement. By also citing subdivision (e)(1) of section 12022.53, the People preserved the argument that defendant should also be subjected to the gun use enhancement as a principal if, following a trial and the presentation of evidence, the jury found that Reil, who was also at the scene with a gun, was the one who had fired the fatal shot. The jury verdict form was consistent with the amended indictment in that it stated defendant either personally *or* vicariously fired the gun.

"A defendant has a due process right to fair notice of the allegations that will be invoked to increase the punishment for his or her crimes. [Citation.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1227.) However, even when the indictment fails to allege each fact required by the statute in question, that does not mean the defendant's due process rights have been violated. (*Id.* at pp. 1225-1229.) "California's system of criminal pleading under [Penal Code] section 952 relies in part upon the transcript of the grand jury hearing or preliminary examination which must be furnished to the defendant to inform him of particular circumstances of his offense not shown by the accusatory

pleading. [Citations.]" (*People v. Jordan* (1971) 19 Cal.App.3d 362, 369.) Thus, the defendant "learn[s] the details of the charges filed against him" from the transcript of the proceedings. (*People v. Jones* (1990) 51 Cal.3d 294, 318-319.) It is the transcript that provides the "defendant practical notice of the criminal acts against which he must defend.' [Citation.]" (*People v. Butte* (2004) 117 Cal.App.4th 956, 959, italics omitted.)

In the matter before us, the grand jury transcript includes the testimony of Dominguez. She testified that defendant initially said Reil was the one who had shot Felix, but later confessed that he himself was the one who had done it. Defendant was clearly on notice that he needed to defend against an allegation that he was the shooter, both with respect to the count 1 murder charge and the Penal Code section 12022.53, subdivision (d) enhancement allegation.

Indeed, at trial defendant confessed to being the shooter. He defended himself by contending the shooting was accidental, justifiable homicide, or imperfect defense of another. He was obviously on notice that he needed to defend against the allegation that he was the shooter. Consequently, the ambiguity in the amended indictment did not violate his due process rights.

Furthermore, to the extent the inconsistency between the citation to Penal Code section 12022.53, subdivision (d) and the verbiage of the amended indictment about the discharge of a firearm by "another principal" created confusion as to the offense of which defendant was accused, even when viewed against the backdrop of the grand jury transcript, defendant could have filed a demurrer. (Pen. Code, §§ 952, 1004; *People v. Biane*, *supra*, 58 Cal.4th at p. 388; *People v. Keating*, *supra*, 21 Cal.App.4th at pp. 150-151; *People v. Jordan*, *supra*, 19 Cal.App.3d at pp. 369-370.) Having failed to do so, he has waived any objection that he did not have adequate notice of the charged offense. (Pen. Code, § 1012; *People v. Biane*, *supra*, 58 Cal.4th at p. 388.)

As a final note, we observe that, in response to our question regarding the conflict between the amended indictment and the jury verdict form, defendant raised an unrelated issue. That is, he said he "had no occasion to defend against an allegation that

16

he personally discharged the gun because no such allegation was ever lodged by the indictment *or the instructions*." (Italics added.) Of course, as we have already discussed, defendant did defend against the allegation, by contending the shooting was accidental, justifiable homicide, or imperfect defense of another. Therefore, his argument that he had no opportunity to defend against the allegation is refuted.

*(2) Imposition of both gun and gang enhancements—*

As mentioned previously, the court sentenced defendant to 25 years to life on the Penal Code section 12022.53, subdivisions (d) and (e)(1) gun enhancement, to run consecutively to the sentence on count 1, and to 10 years on the Penal Code section 186.22, subdivision (b)(1) gang enhancement, to run concurrently with the sentence on count 1. Defendant, citing Penal Code section 12022.53, subdivision (e)(2), claims the court erred in imposing the gang enhancement.

Penal Code section 12022.53, subdivision (e)(2) provides: "An enhancement for participation in a criminal street gang pursuant to . . . Section 186.20 [et seq.] . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."

Defendant contends it was error to impose the Penal Code section 186.22, subdivision (b)(1) gang enhancement when the jury did not find that he personally was the one who shot Felix. He emphasizes that the jury found that he "personally *or vicariously* discharged" the gun. (Italics added.)

Defendant further asserts that the amended indictment alleged only the vicarious version of the Penal Code section 12022.53 enhancement and that the jury instructions were based on vicarious discharge as well. As we have stated previously, however, the amended indictment cited both Penal Code section 12022.53, subdivisions (d) and (e)(1)—the personal *and* vicarious grounds for enhancement.

As for the jury instructions on the Penal Code section 12022.53 enhancement, the jury was instructed: "If you find the defendant guilty of the crime

17

charged in Count 1 . . . and you find that the defendant committed that crime for the benefit of . . . a criminal street gang . . . , you must then decide whether, for that crime, the People have proved the additional allegation that one of the principals personally used a firearm during that crime and caused death. . . . [¶] To prove this allegation, the People must prove that: [¶] 1. Someone who was a principal in the crime personally used a firearm during the commission of the murder or manslaughter . . . ." The instruction further stated: "A person is a principal in a crime if he directly commits or attempts to commit the crime or if he aids and abets someone else who commits or attempts to commit the crime."

These jury instructions did not, as defendant contends, preclude the jury from finding that he personally discharged the gun. The jury need only have found that he directly committed or attempted to commit the crime, in which case he was a principal, and that he personally discharged the firearm. We do, however, agree that the verdict form did not ask the jury to specify whether it found that he personally discharged the gun. At the same time, defendant himself admitted at trial that he was the shooter and his counsel conceded the point, both when the proposed jury instructions were being discussed among counsel and the court, and when arguing before the jury.

Defendant, citing *People v. Salas* (2001) 89 Cal.App.4th 1275, contends that because the jury did not make a specific finding that he was the shooter, a reversal of the Penal Code section 186.22 enhancement is required. In *Salas*, the court applied Penal Code section 12022.53, subdivision (e)(2) to reverse a Penal Code section 186.22 enhancement where the defendant "was never found to have *personally* used a firearm . . . ." (*People v. Salas*, *supra*, 89 Cal.App.4th at p. 1281.) However, in that case, "[t]here was no unequivocal direct evidence as to the identity of the person who actually fired the shots that struck [the victim]." (*Id.* at p. 1278.) In the case before us, in contrast, defendant admitted that he shot Felix.

Furthermore, as defendant acknowledges in his supplemental letter brief, Penal Code section 12022.53, subdivision (j) provides: "For the penalties in this section to apply, the existence of any fact required under subdivision (b), (c), or (d) shall be alleged in the accusatory pleading and *either admitted by the defendant in open court* or found to be true by the trier of fact. . . ." (Italics added.) Here, defendant admitted in open court that he was the shooter. This admission supports a finding of personal discharge of a firearm and the imposition of a gun enhancement under section 12022.53, subdivision (d). Section 12022.53, subdivision (e)(2), then, is inapplicable.

"A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court. It must be upheld when, if so construed, it expresses with reasonable certainty a finding supported by the evidence [citation]." (*People v. Radil* (1977) 76 Cal.App.3d 702, 710; accord, *People v. Jones* (1997) 58 Cal.App.4th 693, 710-711.) Here, defendant admitted to being the shooter. In closing argument, counsel for both the People and defendant repeatedly reminded the jury of defendant's admission. Counsel for the People argued that defendant had no excuse for the killing and should be found guilty of murder. Defendant's counsel argued that defendant shot Felix by accident, or by justifiable homicide or imperfect defense of another, and should not be found guilty. In other words, because defendant conceded that he shot Felix, the question put to the jury was whether he committed murder or whether he had a defense to the charge. Given this, the verdict form, although stating defendant "personally or vicariously discharged a firearm" cannot reasonably be construed as containing a finding that someone other than defendant shot Felix. (*People v. Radil*, *supra*, 76 Cal.App.3d at p. 710; *People v. Jones*, *supra*, 58 Cal.App.4th at pp. 710-711.)

As a final point, defendant's citation to Penal Code section 1157 and related cases is unavailing. That statute, pertaining to the requirement that the trier of

19

fact affix the degree of a crime, is inapposite.[3]

> *(3) Concurrent sentence for street terrorism—*
>
> > *(a) Nunc pro tunc orders and erroneous abstract of judgment*

The People assert that the trial court properly imposed a two-year sentence on the street terrorism conviction, to run concurrently with the sentence on the murder conviction, but that the abstract of judgment fails to reflect the street terrorism sentence. They are correct.

As noted above, 18 days after defendant filed his notice of appeal, the court entered an order changing the judgment. The minutes state: "STATE PRISON sentence as to count(s) 2 entered in error. (Entered NUNC_PRO_TUNC on 10/22/13[.]) [¶] Count disposition of Found Guilty by Jury deleted as to count(s) 2. (Entered NUNC_PRO_TUNC on 10/22/13[.]) [¶] Count(s) 2 DISMISSED – Other reason. (Entered NUNC_PRO_TUNC on 10/22/13[.])" The minutes also state: "DOJ Correction Abstract sent."

In our further briefing order, we asked the parties to file supplemental letter briefs "addressing: (1) the effect of the above-referenced nunc pro tunc orders; (2) whether the trial court had the jurisdiction to enter the nunc pro tunc orders while the appeal was pending; (3) whether the defendant's challenge to the two-year sentence on count 2 is moot; and (4) whether the [People] can challenge the fact that the abstract of judgment fails to show a conviction and sentence on count 2 when the [People] failed to file an appeal."

As shown in their supplemental briefing, the parties agree that the trial court was without jurisdiction to enter the nunc pro tunc orders in question after

---

[3]      Penal Code section 1157 provides: "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury, or the court if a jury trial is waived, must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury or the court to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree."

defendant had filed his notice of appeal. As our Supreme Court has made clear, "'"[t]he filing of a valid notice of appeal vests jurisdiction of the cause in the appellate court until determination of the appeal and issuance of the remittitur" [citation] and deprives the trial court of jurisdiction to make any order affecting the judgment [citation].' [Citation.]" (*People v. Wagner* (2009) 45 Cal.4th 1039, 1061.) The parties also agree that there are certain exceptions to this rule, but that they do not apply in the present case.

"'It is not open to question that a court has the inherent power to correct clerical errors in its records so as to make these records reflect the true facts. [Citations.] The power exists independently of statute and may be exercised in criminal as well as in civil cases. [Citation.] The power is unaffected by the pendency of an appeal . . . . [Citation.] The court may correct such errors on its own motion or upon the application of the parties.' [Citation.] Courts may correct clerical errors at any time, and appellate courts . . . that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts. [Citations.]" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

The parties agree that the nunc pro tunc orders in question did not serve to correct clerical errors. Certainly, they are correct. To delete a jury's guilty verdict and dismiss a count after judgment has been entered is not to correct a clerical error. Consequently, we hold the nunc pro tunc orders were void, and of no effect. That being the case, defendant's challenge to the sentence as originally pronounced on count 2 is not moot, as the parties also agree.

The parties further agree that even though the People did not file an appeal, they are not precluded from pointing out the clerical error in the abstract of judgment, which does not show a conviction and sentence on count 2. This is so, the parties observe, because this court always has the power to correct a clerical error, whether on its own motion or at the request of a party. (*People v. Mitchell*, *supra*, 26 Cal.4th at p. 185.) It matters not that the People were the first to note that the abstract of judgment does not reflect the original sentencing order on count 2. We, too, agree. This court is now aware

of the matter and may address it irrespective of which party first drew attention to the matter.

We do so now. We conclude the court was without jurisdiction to enter its nunc pro tunc order declaring the street terrorism sentence to be erroneous, and consequently, that order is void. The abstract of judgment must be corrected to reflect the concurrent two-year sentence for street terrorism. That is not the only way in which the abstract must be changed, however, as we shall now discuss.

*(b) Penal Code section 654 stay*

Defendant agrees with the trial court's apparent conclusion that the street terrorism sentence was improper. He says it should have been stayed under Penal Code section 654 and *People v. Mesa* (2012) 54 Cal.4th 191.

Penal Code section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." "Section 654 thereby bars the imposition of multiple sentences for a single act or omission, even though the act or omission may violate more than one provision of the Penal Code. [Citation.] This is true even where the court orders multiple sentences to be served concurrently. 'It has long been established that the imposition of concurrent sentences is precluded by section 654 [citations] because the defendant is deemed to be subjected to the term of *both* sentences although they are served simultaneously.' [Citation.] Instead, the accepted 'procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable.' [Citation.]" (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1413-1414.)

In *People v. Mesa*, *supra*, 54 Cal.4th 191, the Supreme Court held the trial court erred in failing to stay Penal Code section 186.22, subdivision (a) sentences for active participation in a street gang, where the defendant was also sentenced for assault with a firearm and possession of a firearm by a felon, and each sentence was based on the

22

same act of shooting a victim.  (*Id.* at pp. 193, 195, 197.)  The court observed that "'section 654 precludes multiple punishment for both (1) gang participation, one element of which requires that the defendant have "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of th[e] gang," [citation] and (2) the underlying felony that is used to satisfy this element of gang participation.'  [Citation.]" (*Id.* at pp. 197-198.)  It further stated this rule "limit[s] punishment for the offense to circumstances in which the defendant's willful promotion, furtherance, or assistance of felonious conduct by a gang member was not also the basis for convicting the defendant of a separate offense . . . ."  (*Id.* at p. 198.)

Defendant in the matter before us asserts that his act of killing Felix was the basis of both the street terrorism conviction and the murder conviction, so Penal Code section 654 and *People v. Mesa*, *supra*, 54 Cal.4th 191 should be applied to require the stay of his sentence on the street terrorism conviction.  The People disagree, contending that when defendant killed Felix he harbored a separate intent, which was not incidental to the murder, to assist fellow gang members in the commission of a robbery.  They explain that the murder charge was tried under theories of malice aforethought and felony murder during an attempted robbery and they claim that there was an implied finding that defendant "assisted his fellow gang members in the commission of an attempted robbery."  They extrapolate that because defendant was convicted of murder, but not also attempted robbery, *People v. Mesa*, *supra*, 54 Cal.4th 191 is inapposite.

We disagree with the People's argument and their characterization of the record.  It is true the jury was instructed that murder could be predicated on either malice aforethought or felony murder, with the felony in question being either robbery or attempted robbery.  However, had the jury found that defendant was participating in either a robbery or an attempted robbery when he killed Felix, it would have been required to find that he committed murder in the first degree.  (Pen. Code, § 189; *People v. Mendoza* (2000) 23 Cal.4th 896, 908.)  But the jury did not so find.  It found that he committed murder in the second degree.  This being the case, the jury must have

23

determined that defendant was not involved in a robbery or attempted robbery at the time he shot Felix.

Moreover, in instructing the jury on active participation in a street gang (Pen. Code, § 186.22, subd. (a)), the court stated that one of the elements of the crime was that defendant "willfully assisted, furthered, or promoted felonious criminal conduct by members of the gang . . . ." It defined "felonious criminal conduct" as "committing or attempting to commit any of the following crimes: robbery, and or murder." As we have already observed, the jury did not find that defendant committed or attempted to commit either robbery or attempted robbery, or it would have found him guilty of first degree murder. Consequently, it must have found that the felonious conduct in which defendant engaged was murder.

In other words, defendant's act of killing Felix was, just as he argues, used both to support his conviction and sentence for second degree murder and to serve as the felonious conduct on which the active gang participation conviction and sentence were based. We reject the People's argument to the contrary. The court should have stayed the sentence on the street terrorism conviction.

## C. Erroneous Minute Order:

As defendant duly points out, at the court trial on prior convictions, the court found one of the alleged prior convictions not true, for technical reasons. It was a 2004 prior conviction. However, the minute order erroneously states both that the 2004 prior conviction was found true and that the court exercised its discretion to strike it. Defendant requests that this court direct the trial court to issue a new minute order correcting the two clerical errors.

The People agree that "the minute order is inconsistent with the trial court's oral pronouncement" in both respects and that the errors should be corrected. So do we. (*People v. Mitchell*, *supra*, 26 Cal.4th at p. 185; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385-386.) We order the minutes corrected to delete the erroneous

24

statements that the court found the 2004 prior conviction to be true and that it exercised its discretion to strike the 2004 prior conviction.  (*People v. Zackery*, *supra*, 147 Cal.App.4th at p. 386.)

## III

## DISPOSITION

The matter is remanded to the trial court with directions to correct its minute order to delete the erroneous statements that it found the 2004 prior conviction to be true and that it exercised its discretion to strike that conviction, and to reflect instead that it found the 2004 prior conviction to be not true.  The trial court is further directed to amend the abstract of judgment to reflect the concurrent two-year sentence on the Penal Code section 186.22, subdivision (a) conviction and to further reflect that the sentence on that conviction is stayed.  The trial court shall forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

MOORE, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

THOMPSON, J.

25